### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
_____
                                       )
RAFAEL DE ARMAS,                       )
                    Plaintiff,         )
                                       )        Civil Action
v.                                     )        No. 21-11069
                                       )
NELSON ALVES and                       )
JOSEPH L. ELSMORE,                     )
                                       )
                    Defendants.        )
_____)
```

### MEMORANDUM AND ORDER

March 18, 2024

Saris, D.J.

### INTRODUCTION

Rafael De Armas sues Officer Joseph L. Elsmore and Superintendent Nelson Alves pursuant to 42 U.S.C. § 1983 for violating his Eighth Amendment rights. De Armas, who was incarcerated under Defendants' supervision, alleges that Elsmore used excessive force against him by slamming him to the ground on February 21, 2021. De Armas claims that Alves subsequently decided to confine him in a restricted housing unit for over six months despite his well-documented and serious mental illness. Defendants counter that De Armas's excessive-force claim against Elsmore fails as a matter of law and even if not, both Elsmore and Alves are entitled to qualified immunity. After a hearing and review of

the record, the motion is **DENIED** as to Elsmore but **ALLOWED** as to Alves (Dkt. 59).[1]

## BACKGROUND

Drawing all inferences in favor of De Armas, the Court considers the following facts undisputed unless otherwise noted.

## I.   Parties

Plaintiff De Armas is a sixty-nine-year-old man incarcerated by the Commonwealth of Massachusetts. At all times relevant to this case, De Armas was incarcerated at Massachusetts Correctional Institution at Norfolk ("MCI-Norfolk"), a medium-security facility in Norfolk, Massachusetts. De Armas suffers from depression and bipolar disorder, which are considered serious mental illnesses by the Department of Correction ("DOC"). Under DOC supervision, he regularly takes prescribed medications -- Wellbutrin and lithium -- to manage his mental illnesses.

Defendant Elsmore is a corrections officer who has worked at MCI-Norfolk since 2017. Defendant Nelson Alves has been the Superintendent of MCI-Norfolk since 2020.

---

[1] De Armas also raised claims under the Fourteenth Amendment's Equal Protection Clause and Due Process Clause. See Dkt. 1 at 16-17. De Armas does not contest the grant of summary judgment on those claims, so Defendants' motion is **ALLOWED** as to De Armas's standalone Fourteenth Amendment claims.

II.  **Use of Force**

On the night of February 21, 2021, De Armas took his medications at the MCI-Norfolk hospital's medication line and began walking back to his living quarters. De Armas paused in an alleyway near MCI-Norfolk's grass Quad. Around the same time, Elsmore, who had just left his post at the medication line, entered the alleyway. Elsmore asked De Armas what he was doing and then ordered him to stop and submit to a search. De Armas refused and became agitated because he mistook Elsmore for a corrections officer who had assaulted him at a previous facility. Francesco Rondinelli, a fellow corrections officer who had been posted near the Quad, witnessed the encounter between Elsmore and De Armas from afar and began approaching when he saw Elsmore waving for assistance.[2]

Surveillance footage captured some of what followed. See Dkt. 61, Exh. F at 19:17:34-19:17:57. As De Armas kept walking through the alleyway toward his housing unit, Elsmore walked slightly ahead of De Armas and to his left. Elsmore continually

---

[2] Elsmore claims that as he approached De Armas, he saw De Armas wrapping pills in cellophane. He alleges that when he confronted De Armas, De Armas threw the wrapped pills into the snow around a nearby fire escape and continued to walk toward his housing unit. Elsmore also claims that at some point, he saw a pill in De Armas's mouth. After the incident, another officer reported that he found a pill wrapped in cellophane in the area, although it did not match the color of the pills Elsmore claimed he saw De Armas handling. There is no evidence of the recovered pill's chemical composition, nor whether it matched De Armas's medication.

placed himself in De Armas's path and extended his right arm toward De Armas. For about thirteen seconds, De Armas walked forward and slightly to the right, distancing himself from Elsmore, while waving his open hands and telling Elsmore he had nothing in them. See id. at 19:17:34-19:17:47; Dkt. 76 at 6.

As De Armas and Elsmore approached a T-junction in the sidewalk, De Armas began to turn left toward his housing block, into Elsmore's extended arm. See Dkt. 61, Exh. F at 19:17:49. By this time, Rondinelli was approaching within Elsmore's line of sight. Id. Elsmore, still positioned in front of De Armas, stopped ceding ground and held his arm out to De Armas's chest, physically preventing De Armas from turning left. Id. at 19:17:52. De Armas attempted to move Elsmore's arm out of the way twice. Id. at 19:17:51-19:17:54; Dkt. 76 at 5. As Rondinelli arrived just a few feet away, De Armas pushed Elsmore's arm away a third time. See Dkt. 61, Exh. F at 19:17:54. Elsmore then pulled De Armas in by his right shoulder and wrapped his arms around De Armas's torso from the rear. See id. at 19:17:54-19:17:55. The surveillance footage is unclear as to what happened next. Under De Armas's version, Elsmore lifted him off the ground and slammed him onto the pavement below. See id. at 19:17:54-19:17:57. Elsmore and Rondinelli restrained De Armas on the ground for around a minute before other officers arrived, although it is not clear from the footage whether they used any additional force on the ground. See

id. at 19:17:54-19:19:03. No one other than Elsmore, Rondinelli, and De Armas appears in the footage until around forty seconds after the takedown. See id. at 19:18:21.

Elsmore, who is 6'3" tall, is larger and a full head taller than De Armas in the surveillance footage. See id. at 19:17:54; see also Dkt. 61-4 at 43:3-9. The encounter left De Armas's right hand bloodied, bruised, scraped, and swollen. De Armas still suffers pain in his right shoulder and arm from the incident. A nurse at MCI-Norfolk treated his physical injuries, noted he had a "mental health condition," and cleared him for placement in a Restrictive Housing Unit ("RHU"). Dkt. 76 at 7. RHU entailed being confined to a cell for twenty-two hours per day.[3] Massachusetts regulations require that "[b]efore placement in Restrictive Housing, an inmate shall be screened by a Qualified Mental Health Professional to determine if the inmate has a serious mental illness" or "if Restrictive Housing is otherwise clinically contraindicated." 103 Mass. Code Regs. § 423.08. An offsite mental health clinician was "notified" about De Armas's placement in the RHU but did not assess him or opine on his fitness for solitary confinement. See Dkt. 76 at 7; Dkt. 61-3 at 65:17-67:24. However, qualified mental health professionals did see De Armas on February 22nd, 23rd, and 24th. See Dkt. 64. The clinician who saw him on

---

[3] DOC has since discontinued RHU in favor of arrangements with more out-of-cell time. See Dkt. 61-3 at 51:16-22.

February 22nd reported that De Armas "denied current [mental health] concerns" and "reported he . . . will be able to manage in RHU." Id. at 3. That clinician concluded that he was "[s]table" and "cleared to RHU." Id. Clinicians coded De Armas as "2AB" or "MH2AB" on mental health assessments, indicating among other things that he met the "definition for Serious Mental Illness." See id. at 1, 5, 9; 103 D.O.C. § 650.06(B)(1).

Elsmore also received treatment the night of February 21st for injuries to his right hand and elbow. Elsmore says he took De Armas down because he felt threatened by De Armas "yelling at [him], enter[ing] his personal space," pushing his arm, and refusing to comply with his orders. See Dkt. 76 at 6. Elsmore's shift commander submitted a "use of force package" that concluded Elsmore had complied with DOC policy. See id. at 8. Alves reviewed the package and agreed with the shift commander's conclusion.

## III. Solitary Confinement

After receiving treatment for injuries to his hand, De Armas was immediately placed in the RHU. On February 22nd, De Armas received notice from Alves that he had been placed there because he was awaiting a disciplinary hearing and posed an "unacceptable risk . . . to the operation of the facility." Dkt. 61-15 at 1; see also Dkt. 76 at 18 (noting that "Plaintiff was in awaiting action status and housed within the RHU at MCI-Norfolk, pending the outcome of [his] disciplinary report"). The notice estimated that

De Armas would be in the RHU only for a week. It also stated that there was no available placement for De Armas in a Secure Treatment Unit ("STU") or Secure Adjustment Unit ("SAU") -- housing arrangements that provide specialized services to individuals with serious mental illnesses, see 103 Mass. Code Regs. § 423.06 -- and that De Armas's housing would "be identified following the disciplinary process." Dkt. 61-15 at 1; see 103 Mass. Code Regs. § 423.09(2)(a) (requiring that incarcerated people with serious mental illness may not be placed in the RHU unless an official certifies that "there is no available placement in an STU or SAU," attests that "efforts are being undertaken to find appropriate housing," and provides "the status of the efforts"). MCI-Norfolk did not have SAU or STU units, but Alves had the authority to transfer De Armas to other facilities with open slots pending his hearing. See 103 Mass. Code Regs. § 423.11 (allowing transfer of an incarcerated person "awaiting a hearing for a violation of institution rules" to STU or SAU "following recommendation from the Placement Review Committee and a determination by the Superintendent" that "the inmate no longer requires Restrictive Housing but cannot be placed in general population"); but see Dkt. 61-3 at 81:16-82:16 (Alves testifying that transferring

De Armas to a different facility for SAU or STU "wouldn't be my call until the . . . disciplinary proceeding is done").

Pursuant to 103 Mass. Code Regs. § 423.09(1)(a), a Placement Review Committee met every Monday, Wednesday, and Friday to determine whether to keep De Armas in the RHU, transfer him to an SAU or STU, or release him back to general population. The Committee included Alves, security personnel, medical and mental health staff, and others. Regulations required the Committee to consider the totality of De Armas's case, including "mental health issues," and to keep him in the RHU "only if the Superintendent . . . determine[d] that [De Armas] pose[d] an unacceptable risk" to other people, property, or the operation of the facility. 103 Mass. Code Regs. § 423.09(1)(b)-(c). From De Armas's placement in the RHU on February 22nd until March 11th, the Placement Review Committee's notes stated that although Alves believed De Armas still posed a threat to the facility, he was "not reasonably expected over 30 days [in the] RHU." Dkt. 76 at 16.

On March 11th, MCI-Norfolk's Correctional Program Officer ("CPO") reviewed De Armas's confinement in the RHU as required by 103 Mass. Code Regs. § 423.09(3)(a). The CPO reiterated that De Armas had been "confined to restrictive housing awaiting a hearing" and that confining him to the RHU was appropriate because of the nature of his disciplinary report. Dkt. 76 at 16. As required by 103 Mass. Code Regs. § 423.09(3)(a)(4), De Armas was

provided "Standards and Goals" indicating how to increase his chances of being released from the RHU. Alves reviewed the CPO's report and concurred with its rationale for keeping De Armas in the RHU. Alves later testified that even if De Armas had complied with all the standards and goals provided, the Placement Review Committee would not have released him pending his hearing. See Dkt. 61-3 at 97:12-19. The following day, the Placement Review Committee's notes indicated that De Armas was "reasonably expected over 30 days [in the] RHU," and that per the March 11th review, Alves had determined De Armas still posed a threat to the facility's operation. Dkt. 76 at 16.

De Armas learned on March 9th that his disciplinary hearing before DOC's Central Inmate Disciplinary Unit would occur later that month, on March 30th. On March 24th, he received notice that he would have his hearing a day ahead of schedule, on March 29th. However, on April 2nd, his hearing was postponed to April 13th.

On May 13th, pursuant to 103 Mass. Code Regs. § 423.09(3)(c), a three-person committee of MCI-Norfolk employees formally reviewed De Armas's continued confinement in the RHU. Alves was not on the committee. The committee determined that "[c]ontinued retention in restrictive housing [wa]s warranted" because of the seriousness of his alleged misconduct. Dkt. 61-13 at 4. Alves denied De Armas's appeal of the committee's report and again concurred in its rationale. He also noted that De Armas's hearing

had been postponed twice and would now occur on May 27th. Notably, neither the report nor Alves's review mentioned De Armas's serious mental illness. On June 2nd, De Armas was informed that his hearing had again been postponed, this time until June 10th.[4]

At his June 10th disciplinary hearing, De Armas was found guilty of one charge, and the other twelve charges against him were dismissed. Alves did not participate in the hearing. De Armas received a sanction of four months in the Department Disciplinary Unit, a restrictive housing unit where DOC sends incarcerated people found guilty of misconduct, with his four months in the RHU credited as time served.

De Armas appealed his sanction on June 30th. Because De Armas was found guilty at his hearing, Alves decided to place him in custody status review to determine whether he should be reclassified. De Armas's appeal of his sanction was denied on August 3rd and on August 13th, the reclassification board raised his classification and recommended transferring him to Souza-Baranowski Correctional Center ("SBCC"), a maximum-security facility. Dkt. 76 at 12; Dkt. 61-3 at 156:4-16. De Armas appealed his reclassification, but this appeal also was denied on August

---

[4] The record is unclear as to whether De Armas received notice of each continuance prior to each scheduled hearing date. See Dkt. 61-3 at 126:23-127:9 (Alves testifying that he did not know whether De Armas "would've received a notice of continuance before March 30th if [his hearing] wasn't going to happen on March 30th").

29th. Two days later, De Armas was transferred to SBCC, where he remains today. From June 10th, when De Armas finished serving his four-month sanction, to August 31st, when he was transferred to SBCC, De Armas remained housed in MCI-Norfolk's RHU.

According to De Armas's log on MCI-Norfolk's Inmate Management System, during his 191-day placement in the RHU, he interacted with qualified mental health professionals forty-one times. See Dkt. 61, Exh. U. Although the log is unclear as to how long most of these interactions lasted and where they occurred, De Armas met with a clinician outside his cell at least six times. See id. (noting out-of-cell visits on March 24th, April 12th, May 7th, June 9th, June 29th, and July 21st).

## IV.  **Mental Health Evaluation**

De Armas submits a mental health report written by Dr. James Greer, a licensed psychiatrist, for this litigation. See Dkt. 77-2. Dr. Greer reviewed De Armas's past mental health records and interviewed De Armas via video-call on May 22, 2023. De Armas has been hospitalized at Bridgewater State Hospital four times. According to Dr. Greer, De Armas suffers from depression and bipolar disorder with signs of paranoia. Dr. Greer opines that De Armas's past "decompensations have been directly attributed to his lengthy placements in segregation," and that, "based on a reasonable degree of medical certainty," De Armas's six-month placement in the RHU "caused significant mental harm, was dangerous

11

to his wellbeing, and was inappropriate given his medical diagnosis." Dkt. 71-1 at 5-6.

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). A material fact is one with the "potential of changing a case's outcome." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018).

In general, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal citations and quotations omitted). "The court must view the facts in the

light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." <u>Carlson v. Univ. of New Eng.</u>, 899 F.3d 36, 43 (1st Cir. 2018).

Where the record includes "a videotape capturing the events in question," the Court should "view[] the facts in the light depicted by the videotape." <u>Scott v. Harris</u>, 550 U.S. 372, 378, 381 (2007). And if "opposing parties tell two different stories, one of which is blatantly contradicted" by the video "so that no reasonable jury could believe it, a court should not adopt that version of the facts." <u>Id.</u> at 380.

**DISCUSSION**

### I.   <u>Excessive Force</u>

De Armas claims that Elsmore violated his Eighth Amendment rights by "lift[ing] him into the air" and "gratuitously body slamm[ing] him to the pavement." Dkt. 75 at 2. The Eighth Amendment protects against "cruel and unusual punishments," including "unnecessary and wanton infliction of pain" during incarceration. U.S. Const. amend. VIII; <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986). An Eighth Amendment claim for excessive force has two components. First, the plaintiff must show that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." <u>Staples v. Gerry</u>, 923 F.3d 7, 13 (1st Cir. 2019) (quoting <u>Hudson v. McMillan</u>, 503 U.S. 1, 8 (1992)). Second, the plaintiff must show that the force "was applied . . .

maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." Id. (quoting Whitley, 475 U.S. at 320-21). Elsmore argues that De Armas fails both prongs because he suffered only a de minimis injury, and because Elsmore used force reasonably in response to De Armas "yelling at [him], enter[ing] his personal space," pushing his arm, and refusing to comply with his orders. See Dkt. 76 at 6.

First, the objective prong. "[D]e minimis uses of physical force" cannot constitute Eighth Amendment violations, see Hudson, 503 U.S. at 10, but "there is no requirement of 'serious injury,'" Mullen v. Dep't of Corr., 643 F. Supp. 3d 238, 247 (D. Mass. 2022) (citing Bastien v. Goddard, 279 F.3d 10, 14-16 (1st Cir. 2002)). Elsmore, who was thirty-five years old and 6'3" tall, allegedly lifted De Armas, who was sixty-six years old and several inches shorter, off the ground and slammed him onto pavement. This left De Armas with a bruised, bloody, swollen right hand, and allegedly with continuing pain in his shoulder and arm. A jury could reasonably find that Elsmore's conduct was "objectively harmful enough to establish a constitutional violation." Staples, 923 F.3d at 13 (cleaned up); see Carter v. Symmes, No. 06-10273, 2008 WL 341640, at *5 (D. Mass. Feb. 4, 2008) (holding that a single shove rose beyond de minimis use of force because prison official knew incarcerated person was "severely injured in his hip and knee").

Turning to the subjective prong, "[t]he critical question . . . is whether the force was applied maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline." Skinner v. Cunningham, 430 F.3d 483, 488 (1st Cir. 2005) (cleaned up) (first quoting Whitley, 475 U.S. at 320-21; and then quoting Hudson, 503 U.S. at 7). Courts consider "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Hudson, 503 U.S. at 7 (cleaned up). The severity of the plaintiff's injuries may inform whether the officer's conduct was malicious and sadistic. See Wilkins v. Gaddy, 559 U.S. 34, 38-39 (2010).

Whether Elsmore used force reasonably is a question for the jury. Elsmore was significantly taller and younger than De Armas. On the night in question, De Armas was walking alone back to his living quarters. After Elsmore positioned himself in front of De Armas and placed his arm up to physically block De Armas's path, De Armas pushed Elsmore's arm away to try to walk past him. Moments later, Elsmore brought De Armas down onto the pavement even though Rondinelli, whom Elsmore had waved over for assistance, was just a few feet away. On these facts, which are disputed, a jury could reasonably find that although De Armas refused to follow Elsmore's orders, Elsmore applied force disproportionately to any threat

15

De Armas legitimately posed to Elsmore or the facility's orderly operation. Cf. Orwat v. Maloney, 360 F. Supp. 2d 146, 154 (D. Mass. 2005) (noting that plaintiff's "gesture and words, though concededly belligerent, were not threatening" enough to justify defendant hitting plaintiff in the face). Defendants' reliance on Scott v. Harris is misplaced. A jury could find, for example, that Elsmore could reasonably have de-escalated or restrained De Armas given his significant and known mental health condition rather than taking him to the ground.

Alternatively, Elsmore argues that he is entitled to qualified immunity. Qualified immunity protects government officials from being sued in their individual capacities for damages unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020) (quoting Dist. of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018)). On the first prong, as noted above, the jury could reasonably find that Elsmore violated De Armas's Eighth Amendment Rights. As to the second prong, the Court considers "whether under the plaintiff's version of the facts[,] a reasonable officer should have known that the degree of force used was plainly excessive." Morelli v. Webster, 552 F.3d 12, 25 (1st Cir. 2009). As of 2021, caselaw clearly established that force applied not "in a good-faith effort to maintain or restore discipline" would

violate the Eighth Amendment. <u>See</u> <u>Hudson</u>, 503 U.S. at 7; <u>Mullen</u>, 643 F. Supp. 3d at 249-50; <u>see, e.g.</u>, <u>Carter</u>, 2008 WL 341640, at *5 (denying summary judgment where the prisoner alleged the officer shoved him knowing he was "severely injured in his hip and knee"); <u>Abrams v. Waters</u>, No. 17-1659, 2018 WL 691717, at *7 (D. Conn. Feb. 2, 2018) (finding that a corrections officer responding to a fight violated the Eighth Amendment when, after the fight had ended, he slammed an incarcerated person onto the floor). Whether Elsmore reasonably perceived De Armas as threatening, whether he actually saw De Armas wrapping and throwing pills, and whether his conduct was excessive are factual questions for the jury. <u>See</u> Dkt. 61-4 at 20:19-21:11 (Elsmore testifying that DOC regulations allow for spontaneous use of force "[t]o prevent self[-]harm or serious threat of injury, bodily injury to yourself or others," and to prevent escape). The Court declines to grant summary judgment for Elsmore on the defense of qualified immunity.

## II.  **Deliberate Indifference**

De Armas also claims that Alves violated his Eighth Amendment rights by continually approving his lengthy placement in solitary confinement despite knowing he suffered from serious mental illnesses. Alves moves for summary judgment based on qualified immunity. As noted above, a public official is entitled to qualified immunity unless "(1) [he] violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct

was 'clearly established at the time.'" <u>Irish</u>, 979 F.3d at 76 (quoting <u>Wesby</u>, 583 U.S. at 62-63).

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." <u>Farmer v. Brennan</u>, 511 U.S. 825, 828 (1994). Making out a claim for deliberate indifference requires two showings: first, that the deprivation alleged was "objectively, 'sufficiently serious,'" and second, that the prison official showed "'deliberate indifference' to inmate health or safety." <u>Leite v. Bergeron</u>, 911 F.3d 47, 52 (1st Cir. 2018) (quoting <u>Farmer</u>, 511 U.S. at 832-34). "A prison official is deliberately indifferent where [he] 'knows of and disregards an excessive risk to inmate health or safety.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).

The Supreme Court and the First Circuit have "rejected the idea that prolonged isolation [i]s in itself cruel and unusual punishment." <u>See Jackson v. Meachum</u>, 699 F.2d 578, 584 (1st Cir. 1983) (citing <u>Hutto v. Finney</u>, 437 U.S. 678, 685-86 (1978)). However, segregated confinement "may violate the Eighth Amendment if, in the circumstances, it is extremely disproportionate, arbitrary[,] or unnecessary." <u>See O'Brien v. Moriarty</u>, 489 F.2d 941, 944 (1st Cir. 1974) ("Imposed inappropriately, or for too long a period, even the permissible forms of solitary confinement might violate the Eighth Amendment."); <u>Hutto</u>, 437 U.S. at 686 ("[T]he length of confinement cannot be ignored in deciding whether

the confinement meets constitutional standards."). Prolonged solitary confinement also may violate the Eighth Amendment if the prisoner is not provided "systematic, periodic review of [his] condition, his ability to reenter the general population, and the feasibility of providing means of lessening the rigors of his segregation." Jackson, 699 F.2d at 584 & n.5 (citing Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).

A growing number of circuit courts have held that keeping a person with a serious mental illness in prolonged solitary confinement[5] violates the Eighth Amendment if he is not provided access to adequate mental healthcare.[6] In Palakovic v. Wetzel, the

---

[5] The record does not fully detail the conditions in the RHU but nevertheless supports the conclusion that the RHU constituted solitary confinement. People incarcerated in the RHU were confined to their cells for at least twenty-two hours per day. See 103 Mass. Code Regs. § 423.06; Davis v. Ayala, 576 U.S. 257, 286 (2015) (Kennedy, J., concurring) (equating "administrative segregation" to "solitary confinement"). Additionally, Alves seemed to equate restrictive housing to solitary confinement during his deposition. See, e.g., Dkt. 61-3 at 73:24-74:3, 74:15-20 (Alves agreeing that he found it "justified to place [De Armas] in solitary confinement to await his disciplinary hearing").

[6] See Crane v. Utah Dep't of Corrs., 15 F.4th 1296, 1306-07 (10th Cir. 2021) (acknowledging district court cases holding that "isolating mentally ill inmates in conditions that seriously and predictably exacerbate their mental illness is cruel and unusual" but finding the law not "clearly established"); Melendez v. Sec'y, Fla. Dep't of Corrs., No. 21-13455, 2022 WL 1124753, at *11-12 (11th Cir. Apr. 15, 2022) (per curiam) (affirming grant of preliminary injunction where plaintiff alleged, among other things, that his "mental illness was exacerbated" by six years in solitary confinement). The Seventh Circuit has taken a different approach. See Vasquez v. Braemer, 586 F. App'x 224, 227-28 (7th Cir. 2014) (rejecting Eighth Amendment claim because defendants

decedent's parents sued prison officials and medical personnel for subjecting their son, who suffered from mental health issues including depression and suicidal ideation, to "multiple 30-day stints" of solitary confinement over the course of thirteen months. 854 F.3d 209, 216-17 (3d Cir. 2017). The complaint noted that during the decedent's confinement, the Department of Justice had investigated the prison and ultimately found:

> [A] "system-wide failure of security staff to consider mental health issues appropriately," a "fragmented and ineffective" mental healthcare program, insufficient mental healthcare staffing to meet the prison population's needs, "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system that undermined continuity of care," "[d]eficient oversight mechanisms, including the failure to collect necessary information on critical incidents, such as acts of self-harm," and a lack of training in the proper response to warning signs by prisoners with serious mental illness.

Id. (second and third alterations in original). The Third Circuit held that the plaintiffs had "state[d] a plausible claim that [the decedent] experienced inhumane conditions of confinement to which the prison officials . . . were deliberately indifferent" and reversed dismissal. Id. at 225-26.

Similarly, in Disability Rights Montana, Inc. v. Batista, an advocacy organization sued prison officials in Montana for Eighth Amendment violations on behalf of "all prisoners with serious

―――――――――――

did not believe plaintiff specifically would face serious harm, notwithstanding his known mental illness).

mental illness" confined in state prison. 930 F.3d 1090, 1093 (9th Cir. 2019). The Ninth Circuit reversed dismissal because the plaintiff alleged not only that people with mental illnesses were placed in solitary confinement, but also "that prisoners with serious mental illness [we]re denied diagnosis and treatment of their conditions," that "defendants did not respond appropriately to threats of suicide by mentally ill prisoners," and that "the defendants' policies caused prisoners' mental health to get substantially worse, result[ing] in prisoners inflicting self-harm . . . [and] committing suicide." Id. at 1098.

Based on the undisputed facts in the record, no reasonable jury could find that Alves acted with deliberate indifference to an excessive risk to De Armas's health and safety. Notably, De Armas does not allege that Alves neglected to provide him with proper mental health screening, diagnosis, or treatment. Although his solitary confinement was unduly prolonged,[7] De Armas received

---

[7] The First Circuit recently held that "solitary confinement of more than ninety days" implicates a liberty interest under the federal Due Process Clause. See Perry v. Spencer, No. 16-2444, 2024 WL 702348, at *15 (1st Cir. Feb. 21, 2024) (en banc). Likewise, the Massachusetts Supreme Judicial Court has held that under the federal and state Due Process Clauses, "in no circumstances may an inmate be held in segregated confinement on awaiting action status for longer than ninety days without a hearing." LaChance v. Comm'r of Corr., 978 N.E.2d 1199, 1207 (Mass. 2012). De Armas was confined in the RHU for a total of 191 days, 109 of which were on awaiting action status pending his hearing. As noted above, De Armas does not contest the grant of summary judgment on his due process claims.

a mental health assessment the day after his placement in the RHU and told the clinician that he "w[ould] be able to manage in RHU." Dkt. 64 at 3. He interacted with qualified mental health professionals at least forty-one times -- including at least six visits outside his cell -- during his confinement in the RHU. <u>See</u> <u>id.</u>, Exh. U. Although De Armas's expert opined based on De Armas's past placements in segregated housing that his mental health may have deteriorated because of his confinement in the RHU, there is no evidence his condition actually worsened during this six-month solitary confinement, or that Alves was subjectively aware of any decline. <u>See</u> <u>Scarver v. Litscher</u>, 434 F.3d 972, 975 (7th Cir. 2006) ("Probably [he] should have known, but that would make [hi]m guilty merely of negligence and not of deliberate indifference (the mental state required to establish an Eighth Amendment violation), which would require proof that [he] w[as] conscious of the risk."). Because De Armas cannot show that Alves's conduct rose to the level of an Eighth Amendment violation, Alves is entitled to qualified immunity. <u>See</u> <u>Irish</u>, 979 F.3d at 76.

**<u>ORDER</u>**

For the reasons stated above, Defendants' Motion for Summary Judgment is **<u>DENIED</u>** as to Elsmore but **<u>ALLOWED</u>** as to Alves (Dkt. 59). SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge